**13 So.2d 233**

**MERAUX & NUNEZ, Inc., v. HOUCK et al.**

**No. 36494.**

Dec. 30, 1942.

Rehearing Denied April 12, 1943.

W. C. Holmes, Walter W. Wright, and Emmet Alpha, all of New Orleans, for plaintiff-appellant.

Sol Weiss and Cyril F. Dumaine, both of New Orleans, for defendant-appellee.

Alfred D. Danziger, of New Orleans, amicus curiæ.

HIGGINS, Justice.

The lessor instituted this summary ejectment proceeding under the provisions of the Landlord and Tenant Act (No. 200 of 1936—Dart's Louisiana General Statutes, Sec. 6597), against the lessees, alleging that on October 7, 1940, it entered into a written lease with the defendant for the property described as the Menefee Airport, for a period of five years, at a stipulated monthly rental; that the lease contained a clause reserving to the lessor the right to cancel the lease upon giving the lessee ninety days written notice, should at any time the leased property be required by the State of Louisiana or by the United States; that the Federal Government expressed its need for the property to be used as an advanced base in conjunction with the activities of the Naval Reserve Aviation Base in New Orleans; that the lessor, on April 5, 1941, entered into a written lease with the Navy Department of the United States covering a portion of the premises, commencing on July 5, 1941; and that the lessee had been given a ninety day written notice of the cancellation of the lease, but refused to vacate and surrender possession of the premises. In the alternative, the petition set forth that the lessor was entitled to the cancellation of the lease and possession of the property because the lessee had breached the lease in the following respects: (1) By operating a night club in the admin-

istration building on the property, contrary to the stipulation in the lease requiring the property to be used as an airfield or for aviation business; (2) by operating a night club business on the premises and thereby causing the fire insurance rates to be substantially increased; (3) by failing to make a $100 payment of rent promptly at maturity; (4) by making certain additions or alterations to the administration building without the written permission of the lessor; and (5) in failing to furnish lessor an indemnity lien bond. Lessor also claimed attorney's fees.

It appears that the lessee Gillman sold his interest in the business to his partner, Joy N. Houck, on January 11, 1941, and made no appearance in the suit.

The lessee was given two days within which to answer the rule for possession and Houck filed exceptions of prematurity and of no right and no cause of action, on the ground that the lease provided, as a condition precedent to the lessor's right to cancel the lease before its primary term had expired, that the lessee would receive a ninety day written notice that the Government required the use of the property, and also, that the lessor would pay the lessee the costs of any buildings or improvements placed on the premises, and that while the written notice had been properly served, the lessor refused and failed to make any tender of the amount covering the costs of the improvements placed on the property by the lessee.

In Houck's answer, he reiterated the defenses contained in the exceptions and as to the alternative demand, pleaded, first, the

failure of the plaintiff to give him thirty days written notice of the alleged breaches of the lease, as required by the terms thereof; and, second, estoppel based on acts or conduct of plaintiff's president.

The plaintiff objected to the court considering the defenses contending that it was an attempt on the part of the defendant Houck to convert the summary proceeding into an ordinary action, and filed a motion to strike them out.

The district judge referred the objections and the motion to the merits and then overruled them. He held that the payment by the lessor of the costs of the improvements placed on the premises by the lessee was a condition precedent to the lessor's right to cancel the lease and obtain possession of the property. As to the alternative demands of the petitioner, he concluded that the lessor had failed to give the lessee any written notice of the alleged breaches of the lease, the written notice of cancellation referring to and covering only the fact that the United States Government had need of the premises. From the evidence introduced by both parties, the judge concluded that the defendant had shown that he expended the sum of $5,800 in making improvements on the leased premises under the authority of the provisions of the lease itself, and that the lessor was entitled to the possession of the property upon the payment of the sum of $5,800 to the defendant, and that the rule for possession should be made absolute and the defendant ordered to vacate the premises, conditioned upon the prior payment of the said amount. He

denied the lessor's claim for attorneys' fees. Formal judgment was so entered.

The plaintiff in rule appealed.

■ Counsel for the lessor argue that the trial judge erred in not sustaining their objections and their motion to strike out the defenses, and in refusing to relegate the lessee to a separate ordinary action to claim reimbursement for the costs of the improvements placed upon the property. The issues presented by the defendant in rule's pleadings unquestionably arise from and are founded upon the provisions of the very lease that the lessor has stated granted it the right to cancel the lease. They grow out of the same transaction and are in no way foreign thereto. The lessee is not complaining of the lessor proceeding summarily and is not asking for any delays or other rights which he would be entitled to in an ordinary action. He is meeting the lessor's summary demands with defenses that go to the merits of the controversy, growing out of their relation as landlord and tenant. The lessee is, therefore, not attempting to convert the summary proceeding into an ordinary action. This identical legal question was presented to the court in the case of Wooten v. Jones et al., 200 La. 333, 8 So.2d 46, where we held that the trial judge erred in refusing to consider the defendant in rule's defenses and remanded the case to the district court in order that they might be heard.

The lease in question is on a printed "Standard Form" with typewriting added thereto. It is for a term of five years, commencing October 15, 1940, the consideration

for the first two years being $1,800 per year, payable in equal monthly installments of $150 in advance, and, for the remaining three years, $2,400 per year, payable in equal monthly installments of $200 in advance. The leased premises are described as "Property of lessor in St. Bernard Parish known as the Menefee Airport with metal hangar building and adjacent metal building, administration building, gas station building, tower and beacon."

The leased premises and appurtenances "* * * are accepted by the lessees in their present condition, except for such repairs and improvements as are written into this lease, * * *. Lessees acknowledge that all buildings are sufficiently strong and durable and agree to maintain and keep in good repair the said buildings at lessees' expense. * * *." The lessees obligated themselves not to make "* * * any additions, alterations or improvements whatever to the premises without written permission," and agreed that "all additions, alterations or improvements made by them with or without consent of lessor must remain the property of the lessor, unless otherwise stipulated herein," compensation therefor being expressly waived. The lessees agreed to furnish the lessor with an indemnity bond against liens in a sufficient amount to cover the costs of improvements, in advance of making any on the property. They bound themselves, in the event they made any installation on the premises that increased the insurance rates on the buildings, to pay the increased rate of insurance thereon.

The lease also contained the following pertinent provisions: "Should the lessees at any time violate any of the conditions of this lease, or discontinue the use of the premises for the purpose for which they are rented, or fail to pay the rent, * * * or other expenses assumed under this lease, punctually at maturity, as stipulated; * * * and should such violation continue for a period of thirty (30) days after written notice has been given lessee, then, at the option of the lessor, the rent for the whole unexpired term of this lease shall at once become due and exigible; * * *," or at its option the right "to immediately cancel this lease, * * * without putting lessees in default * * * lessees * * * expressly waiving the legal notices to vacate the premises; * * *" and "lessees shall pay, as fees and compensation to such * * * attorney * * * such sum as will constitute a reasonable fee, * * *."

The lease further provided:

"Lessor reserves the right to cancel lease by giving ninety (90) days written notice to be served personally on lessees or by mail addressed to lessees at the herein leased premises, should at any time the herein leased property, or any part thereof be required by the State of Louisiana or by the United States; in which event the cost of any buildings and physical improvements constructed on said property by lessees other than maintenance and operating expenditures, to be evidenced by paid invoices, shall be reimbursed to lessees.

"All of such buildings and improvements constructed by lessees at the termination or expiration of lease and/or renewals thereof shall become the property of lessor free of any cost provided lease is not terminated or cancelled by lessor as hereinabove stipulated.

&ast; &ast; &ast; &ast; &ast; &ast;

"Lessees shall have the right to renew the herein lease for five (5) years additional by notifying lessor in writing one hundred twenty (120) days prior to the expiration of the said lease and provided lessees have expended in physical improvements made on the herein leased property an amount in excess of Ten Thousand ($10,000) dollars to be evidenced by paid invoices and on the payment of annual rental of Three Thousand Six Hundred ($3,600) dollars per annum, payable monthly in advance, and with the additional consideration of the payment of all the taxes on the herein leased property to be levied for all purposes for the years 1946, 1947, 1948, 1949 and 1950.

"It is further understood and agreed that should the said property, or any part thereof be required by the State of Louisiana or by the United States at any time during the second five year period then in that event Lessor will have the right to cancel and terminate lease by giving lessees ninety (90) days written notice to be served personally on lessees or by mail addressed to lessees at the herein leased premises, by reimbursing to lessees the cost of such physical improvements constructed by them on the herein leased property, other than maintenance and operating expenditures, to be evidenced by paid invoices less the customary depreciation for this class of improvements."

It was also stipulated that the property was leased for an airfield but it was agreed that the lessees "&ast; &ast; &ast; have the right to operate any other business on the premises that is necessary in the operation of the aviation business." The lessees are granted "&ast; &ast; &ast; the right to sublet or grant use or possession of such parts of the property necessary in the conduct of their aviation business."

The record shows that Joy N. Houck, who owned and successfully operated several theatres and a few airports, together with Martin J. Gillman, Jr., rented the premises in question to conduct an aviation business for the training of civilian pilots and operating airplanes for taking passengers on short sightseeing and pleasure trips, or any other business necessary thereto, and that the lessees began their operations on October 15, 1940; that on January 11, 1941, Gillman sold his $200 interest in the business to Houck for the sum of $1,000 and retired therefrom; that the hangar and administration buildings, as they existed, were not suitable for the lessee's purposes; that Houck contemplated making certain alterations on the hangar and doing remodeling work on the other building; that he showed a sketch of the proposed remodeling of the administration building to the president of the lessor corporation; that after this work was started, the lessor's president, who, under a resolution granting him plenary authority, had negotiated for and signed the lease with

the defendant, visited the premises and made no complaint or protest against the remodeling and alterations being done by the lessee; that after the work was substantially completed, the president of the lessor corporation, with representatives of the Navy Department, visited the airport on February 11, 1941, in order to determine whether or not the premises would be suitable for the United States Government's purposes, and at that time, with full knowledge of what was being done, did not inform Houck that he was proceeding in any unauthorized way; that on February 15, 1941, after the lessor's president had been informed that the Government "* * * may require in the immediate future" the Menefee Airport, he wrote Houck a letter calling his attention to the ninety day cancellation clause of the lease; that he had observed that the remodeling had made considerable progress and he had no idea that changes would be made to such an extent; that he refused to permit the lessee to remodel the administration building and to use it as a night club; that he did not consider the night club business a part of the aviation business; that he called his (Houck's) attention to the fact that he had failed to obtain the lessor's written permission to remodel and convert the administration building into a road house; that it was the lessor's desire that the lessee incur no further "expense in operations which might inconvenience and embarrass you and ourselves in the event the decision of the Navy Department would result in their requiring the airport for their use," and that if the Navy Department should decide

that it would require the use of the airport, the lessee would be given the ninety day notice under the terms and conditions of the lease; that on March 8, 1941, the lessor's president wrote Houck another letter stating that he did not have any confirmation of whether the Government would require the use of the airport but as soon as he received it that he would furnish the ninety day notice as provided in the lease; that it was his "desire to ascertain the total amount of costs which have been expended to date in converting the administration building into the night club now operated by you and what amount in relation to the conversion of the property remains unpaid"; that he desired "this information for the purpose of knowing whether or not any lien legally may be placed against the building"; that "the conversion of the administration building into a night club was not an improvement contemplated by the said lease, or in any manner within its intent or meaning or with our approval" and "that the above facts with respect to the said actual costs and expenses remaining unpaid are a matter of necessary protection both to yourselves and to us"; that he wanted to know whether or not the lessee desired "to continue to operate the night club and that part of the small building" which was being used as a service station and a garage, in the event the Government leased the other part of the property; that the purpose of requiring this information was to prepare for the lessee a new lease on the part of the airfield excluded from the contemplated lease with the United States Gov-

ernment; that on March 12, 1942, lessor received a letter from the United States Naval Reserve informing it that it would require the use of a part of the Menefee Airport and requested the terms for leasing the property; that on April 5, 1941, the lessor entered into a lease with the United States Government, commencing July 5, 1941, for a part of the premises not including the administration building, service station and garage, for the sum of $500 per month for one year, with right of renewal for ten years; that on the same day the lessor notified the lessee in writing that it had entered into the lease with the Government for a certain portion of the airport; that it was exercising the option to give ninety days written notice to terminate the lease; that, thereupon, the lessee demanded reimbursement from the lessor for the costs of the improvements constructed on the premises as evidenced by invoices, receipts, and cancelled checks aggregating $6,757.54; that the lessor offered to pay the lessee the sum of $324.52, which the lessee declined to accept; that the lessee refused to surrender possession of the property until his claim was paid; that on May 17, 1941, the lessor notified the lessee in writing that because he was operating a night club on the premises, the fire insurance rates had been increased and that the lessee under the terms of the lease was responsible for the payment of the difference between the old and new premiums; that later, under mutual arrangements, the lessee permitted the United States Government to take possession of the part of the property it leased without prejudice to the rights of any of the parties; and that the operation of a restaurant, bar and recreational place in the administration building was a necessary adjunct to the airport business and that this was the usual and customary manner of doing business at the best airports.

In connection with the petitioner's main demand, its attorneys argue that the ninety days cancellation clause of the lease must be interpreted with reference to the other provisions thereof and especially the clauses that the buildings and improvements on the property were received in good condition and were to be so maintained by the lessee, and that the lessee would make no alterations without the previous written permission of the lessor; and that having failed to obtain its consent thereto, the lessor was not obligated to reimburse the lessee for the costs of the improvements placed on the property.

The attorneys for the defendant in rule contend that the ninety day cancellation provision of the lease, which was typewritten and added to the printed form of the lease, prevailed over the printed clause therein which stated that the lessee would first have to obtain the permission of the lessor before making alterations and improvements on the property, and that the conduct of the lessor's president in handling the matter for it showed that he also construed the controversial parts of the lease in that way.

It will be noted that the lessor's right to cancel the lease before the end of the five year term depended upon the State

of Louisiana or the United States Government requiring the property or any part thereof. It also clearly appears from the provision in question that if the property were so required, the lessor would pay the lessee the cost of any buildings and physical improvements constructed on the property other than operating and maintenance expenditures. In the event the Government required the property, the lessor had the right to cancel the lease if it first served a ninety day written notice personally on the lessee and, second, reimbursed him for the costs of any buildings and physical improvements constructed on the property. If the lease went to the end of its term of five years and was not renewed by the lessee, all of the buildings and improvements placed on the property by the lessee would become the property of the lessor, free of any costs. In the event the lessor terminated the lease sooner, under the ninety day cancellation clause, the lessor obligated itself to pay the lessee the costs of the buildings and improvements placed thereon. It will be observed that the right of the lessee to renew the lease for an additional period of five years was subject to the condition that the lessee notify the lessor, in writing, one hundred and twenty days prior to the expiration of the lease, and show that during the primary term of the lease he had expended, in physical improvements on the leased property, an amount in excess of $10,000, as evidenced by paid invoices covering the same. Neither the cancellation clause nor the renewal clause contain any language which directly or by implication required the lessee to obtain the written

permission of the lessor to place $10,000 of physical improvements on the property. These two provisions in the lease contain no such restriction. The reason why such a clause was not inserted in the lease was because, if the lessor refused to give its written permission to the lessee to place any buildings or improvements on the property, the lessee could not do so and, therefore, it would have been an impossibility for the lessee to have availed himself of the right expressly granted to him under the renewal clause to renew the lease for an additional five years. This, apparently, was the same way the lessor's president construed the provisions of the lease, because, while he knew that the remodeling and alterations were being made to the administration building and the improvements to the hangar were underway, he did not attempt to invoke the printed provision of the lease requiring such written permission until after the improvements were practically finished, and after he was confident that the Federal Government would require a part of the premises for an aviation school. It was then that he wrote the letters attempting to invoke the provision now relied upon.

With reference to the printed clause in which it is stated that the lessee obligated himself not to make any additions, alterations, or improvements to the property without the written permission of the lessor, it will be noted that the improvements were to become the property of the lessor, without compensation, whether they were made "with or without the consent of the lessor * * * unless otherwise stipulated." Ob-

viously, the ninety day cancellation and renewal clauses clearly obligated the lessor to pay the lessee the cost of the improvements. Furthermore, this provision of the lease relied upon by the lessor does not provide, if written permission is not secured, that as a penalty for failure to request and obtain it before placing improvements on the property, the lessee agreed to forfeit his rights to reimbursement therefor.

■ The typewritten provision in the lease whereby the lessee acknowledged that the buildings were "sufficiently strong and durable" and bound himself "to maintain and keep in good repair the said buildings at lessee's expense," certainly does not show that the lessee obligated himself not to alter, remodel, and improve the buildings, as he was clearly granted that right under the ninety day cancellation and renewal clauses. This intention of the parties is made even clearer because the provision in the lease following the above one required the lessee to furnish the lessor an indemnity bond against liens in a sufficient amount to cover the costs of the "improvements" in advance of making them. Therefore, while the lessee acknowledged that the buildings were in good condition when received and bound himself to maintain and keep them in good repair at his own expense, he neither obligated himself not to make any alterations or improvements thereon, nor in the event he made them to waive his right to reimbursement therefor, if the lease were prematurely terminated. The lessee is not asking for the cost of maintenance and keeping the buildings in repair, he is claiming reimbursement of the costs of making improvements on the buildings. With reference to the main demand, it is our opinion that the trial judge properly construed and applied the ninety day cancellation provision of the lease.

■ The lessor, in its alternative demand, claimed that Houck had breached the lease in the five respects already enumerated. In the very clause under which the lessor asserts the right to immediately cancel the lease and to recover a reasonable attorney's fee, it is expressly stated that the lessor will first give the lessee written notice of the alleged breach and should the violation continue for a period of thirty days, the lessor would then have the right to claim the rent for the whole term thereof or immediately cancel the lease. Obviously, the lessor could not claim rent for the whole of the term because it had exercised its right to cancel the lease by renting a part of the premises to the Government. The lessor did have the right to cancel the lease in the event it first gave the lessee written notice of the alleged violations of the lease and the lessee persisted in those violations for a period of thirty days thereafter. The lessor did not give Houck the above-required written notice calling his attention to the alleged violations and that it was its intention to cancel the lease if the said violations were not discontinued within thirty days. The notice of cancellation only mentioned the fact that the Government required the use of a part of the property. Furthermore, there is nothing in this printed clause which

expressly or impliedly deprives the lessee of his right to ask for reimbursement of the costs of improvements placed on the property under the ninety day cancellation and renewal clauses. The lessee is not questioning the right of the lessor to ask for the cancellation of the lease under its terms, but denies the right of the lessor to cancel the lease and obtain possession of the premises without reimbursing him for the costs of the improvements placed thereon, in accordance with the provisions thereof.

■ There is evidence in the record that the restaurant, bar and lounge or recreational place operated in the administration building by Houck was in keeping with the custom of modern airports as a convenience to its patrons and a necessary adjunct thereto. The testimony shows that this type of business was not one that fell in the category of a night club as that term is usually applied and understood. There were no floor shows, entertainers or orchestra. The letter of the lessor with reference to the alleged night club business did not state that this was a violation of the provisions of the lease justifying cancellation thereof, but complained that it had caused an increase in the fire insurance rates and that under the provisions of the lease, the lessee would have to pay the extra premiums therefor.

The claim for $100 for rent for the period from June 15, 1941 to July 5, 1941, arose after the lessor refused to reimburse the lessee for the costs of the improvements on the property, except the sum of $324.-

52, and was insisting that the lessee surrender possession of the property without reimbursement. All previous rent had been promptly paid. In short, the lessor was contending that the lessee owed it $100 and the lessee was claiming that the lessor owed him $6,757.54. In any event, the lessor failed to give the lessee written notice of its intention to cancel the lease for this alleged violation, as required by one of the printed provisions of the lease.

The same observation of lack of written notice of the alleged violation of making the alterations and additions without the written permission of the lessor and in failing to furnish a lien bond are equally applicable to these alleged breaches as grounds for cancellation. Our conclusion on the main issue is also pertinent to the alleged breach with reference to the additions and alterations. As far as the failure to furnish a lien bond is concerned, it was shown that all labor and materials were paid for in full.

This disposes of the alternative demand for the cancellation of the lease on the grounds of the alleged breaches.

■ We have already determined, in connection with the main demand that the lessee is entitled to reimbursement of the costs of the improvements placed on the property as a condition precedent to the lessor's right of possession and the remaining issue is whether or not the judgment of the trial court, in allowing $5,800, is correct.

The lessee Houck produced cancelled checks, vouchers, and receipts showing the

costs of the material and labor in making the improvements on the leased property. In connection with these documents, he and the man who supervised the construction work testified that the items totalling $6,757.54 were correct and went into the improvements and alterations. They were corroborated by testimony of some of the workmen.

In addition to this evidence Houck placed on the stand two witnesses, Messrs. Herbert Benson, architect, and William Wallace, contractor, both of whom are reputable business men, experienced in their fields. They testified that they had examined the alterations and improvements and that it would require an expenditure of approximately $7,000 to make them.

The countervailing proof of the lessor was through E. J. DeArmas, architect, who testified that the improvements were worth $3,310.

The trial judge patiently heard a voluminous amount of evidence and went over each item carefully and eliminated a great many which he considered covered unnecessary embellishments and decorations and disallowed certain other items for apparent lack of proof. It was his conclusion that the lessee had successfully established the total cost at $5,800 for the improvements and he, therefore, rendered judgment for that amount. The lessee Houck has not answered the appeal and asked that that amount be increased and as the evidence supports the finding of the trial judge, we shall not further reduce the claim.

For the reasons assigned, the judgment appealed from is affirmed; appellant to pay all costs of court.

McCALEB, J., takes no part.

ROGERS, J., absent.